JOHN LACK *vs.* HARGRAVES MILLS.

Bristol.    October 25, 1905. — January 2, 1906.

Present: KNOWLTON, C. J., LATHROP, LORING, & SHELDON, JJ.

*Negligence,* Employer's liability.

In an action by an operator of a carding machine against his employer for alleged negligence in maintaining the machine in a defective condition, whereby pellets of hard, lumpy cotton were formed and thrown against the door of a cylinder so as to open the door when it should have been kept closed, thus allowing the plaintiff's hand to pass through it and be injured, if the defendant contends that by the operation of a principle of physics the pellets of cotton must have been thrown by centrifugal force downward, parallel to, past and not against the door, and the plaintiff introduces the evidence of experts who testify that in such a machine and under the circumstances shown the pellets would strike the door, and if also two witnesses testify that they have seen and heard pellets striking and opening the doors of such machines, the question of the defendant's negligence is for the jury.

TORT for personal injuries incurred while in the employ of the defendant. Writ dated April 26, 1904.

The following statement of the case is taken from the opinion of the court :

The plaintiff in this case was a card tender in the defendant's mills. Among other things it was his duty to take away the " waste " or refuse material which is separated from the cotton by carding it. This waste falls to the casing over the doffer from an opening at the end of the main carding cylinder and makes a pile which has to be removed at intervals while the card is running. It falls in the shape of a veil which hides a door in the cover of the main carding cylinder. This door ought to be shut except when the card is being ground or stripped. At the time of the accident it was open, but the fact that it was open was hidden by the veil of falling waste. The plaintiff supposing it to be shut put out his hand to remove the falling waste, his hand went through the open door and was caught by the revolving cylinder and injured. The defendant does not claim that the plaintiff was guilty of contributory negligence, nor that he had assumed the risk. Its only defence was that

the door must have been left open by a fellow servant. The plaintiff introduced evidence tending to show that the door was shut at two o'clock by one Michael Rasimes, who helped the plaintiff strip the card at that time, and that it had not been touched afterwards down to the time of the accident, which was at ten minutes before four. His contention was that the card clothing on the cylinder had been crushed by a hoop of iron which ran through it some two months before the accident; that this had not been properly repaired, and that the result of its being used when not properly repaired was the formation of cylindrical pellets of hard, lumpy cotton, which were thrown against the door with such force as to throw it open. The door was as long as the width of the cylinder, six inches wide, and hinged on its lower edge. The defendant contended that it was physically impossible for the door to be opened in that way.

A short description of the carding machine becomes necessary. It was a revolving flat card manufactured by Hetherington and Sons. The cylinder in question here is the main cylinder. This is covered with " card clothing," which consists of wires about three eighths of an inch long set closely together in a covering fastened to the surface of the cylinder and bent at the ends. This cylinder makes one hundred and sixty-five revolutions a minute. Over the top of and across the cylinder are strips about an inch and a half wide, with similar wires bent at the ends but in the opposite direction. These strips are called flats. The ends of the wires on the flats are nine one thousandths of an inch from the ends of the wires on the cylinder, and their office is to pick the waste out of the cotton. These flats are fastened together on an endless chain, and revolve in the same direction as the cylinder, but at a much slower speed. They leave the cylinder, passing up and back at a point a little above the level of the axis of the cylinder. At this point there is a thin metal plate across the cylinder called the percentage plate. The upper edge of this percentage plate is fifteen one thousandths and the lower edge twenty-eight one thousandths of an inch distant from the ends of the wires on the cylinder, and the top of the door in question rests against this percentage plate. The door is distant from the cylinder about thirty-one one thousandths

of an inch, and, is practically parallel with the surface of the cylinder. Above this door is a brush which takes from the wires on the flats (as they turn to go back on the endless chain) the waste which they have taken up from the cotton, and this waste coheres as it falls and makes a sort of screen outside the door here in question. The cleaned cotton passes under the percentage plate behind the door to another smaller cylinder called the doffer, which takes the cotton from the main cylinder. The cotton is taken from the doffer by a comb. The cotton is then visible and looks like a veil or web. This web is collected in a sort of rope and coiled in cans and taken away.

There was evidence from the plaintiff that the door in question was "almost straight up, so that about five sheets of paper placed between the percentage plate and the door would make it upright." It was admitted that there were no fastenings on the door. The plaintiff's evidence was to the effect that the iron hoop which ran through the card bent down the wires and, although an attempt was made to straighten them, dirty, lumpy cotton passing over the furrow left by the iron formed into hard, cylindrical pellets which, when released after passing under the percentage plate, were thrown with a noise against the door, and by the concussion the door was thrown back beyond equilibrium and so fell open on to the top of the doffer casing.

Peters, the card grinder in charge of the card in question, testified that before the accident here in question, he had seen these doors open the fifth part of an inch nearly every week, and had seen three that were open so that they fell on the waste; and in answer to the question what would make the doors open, he said: "Sometimes when the cotton is lumpy and dirty it goes through and the licker-in takes too much of that cotton and throws it on the cylinder. The cylinder will carry it around once under the flat to the door and then it makes a noise [which he illustrated] and that can throw the door open"; and that at the time of the accident the defendant was using "dirty and lumpy cotton." He also testified that after the iron went through the card and it had been repaired, the card in question "did not work just the same; at the front and the end of the small doffer the cotton used to come out lumpy," lumpier than on the other cards. On cross-examination he said that he had seen a

lump of cotton knock a door and open it part way, but never had seen it knocked wide open so that it fell.

Waldron, who had been a card grinder, had worked on cards twenty-four years, had been general secretary for the carders' union in New Bedford five years, and at the time of the trial was one of the trustees of the New Bedford Textile School, testified confirming the testimony of Peters as to the effect of jamming the wires. When the wires are bent back in this way it is called a jam. He then continued in these words : " A jam is very easily filled up on a card because the wires is all bent, filled up with cotton both good and bad, and if it is filled up a hard substance or a hard piece of cotton coming through the licker-in, striking that place, it cannot get down in the wire because the wire is already filled and it will go between, and it [making a noise], and in very many cases the door will go unless it is well fastened ; that is, the door on the front of the cylinder will open and the door on a Hetherington card will fall down. I saw them many a time. They will do it when the wire is in bad condition on a card, filled up with cotton, because that is about half an inch deep, and the wire on the flats is the same, so that if it was not filled up there is almost an inch space beside the small spaces between where the hard substance could jam down," and that lumpy cotton will do this. On cross-examination he testified that " he once saw a lump of cotton make a door fly open ; it was a hard lump. . . . The lump was probably an inch and a half or two inches and would taper down to ' what we termed a rat tail,' and probably would be as thick as your little finger." " He had seen half a dozen open that way in his experience, mostly on Hetherington cards."

Peters also testified that " at the time of the accident he was downstairs ; he came up and found the plaintiff caught in the card between the doffer and cylinder ; that the door of the cylinder was open, and there was under the door an amount of waste such as would require fifteen minutes running to accumulate."

At the trial the defendant called Rasimes, whose testimony was contradictory. But the jury were warranted from his testimony in finding that he confirmed the plaintiff's testimony that he, Rasimes, shut the door at two o'clock and left it closed. The defendant also called ten other witnesses, who contradicted

almost every fact and every opinion testified to on behalf of the plaintiff.

The plaintiff went to the jury on his second count, which alleged that the accident was caused by the negligence of the defendant in suffering the card to be in a needlessly dangerous, defective and unsuitable condition. The defendant requested a ruling that on the whole evidence the plaintiff could not recover; that there was no evidence of the defendant's negligence, and that he could not recover under the second count. These rulings were refused, the plaintiff had a verdict, and the case is here on exceptions to the refusal to rule as requested.

*R. P. Borden*, (*R. C. Davis* with him,) for the defendant.

*J. W. Cummings*, (*E. Higginson & C. R. Cummings* with him,) for the plaintiff.

LORING, J. [After the foregoing statement of the case.] Without going into detail through the fifteen pages of the defendant's argument, which would be proper on a motion for a new trial since in substance it is to the effect that the plaintiff's story ought not to be believed, the only proposition of law which we have been able to extract from it is this: As matter of physical law, if such pellets of cotton could form and pass under the percentage plate they would be thrown by centrifugal force down parallel with the door and not against it. If the defendant is right as to the abstract principle of physics invoked by it, and if it is a matter of which the court will take judicial notice, we cannot say that as matter of law the plaintiff is wrong in the application made by his experts, who testified that by the law of centrifugal force, applied to the case of pellets pressed down on the wires which would spring up when released from the pressure of the flats and of the percentage plate, the pellets would strike the door, especially in view of the positive testimony of two witnesses that they in fact had seen and heard pellets work as the plaintiff here contended.

The other exceptions were not argued and we treat them as waived.

*Exceptions overruled.*